UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 1:23cv21837

| | | |
|---|---|---|
| MONICA SWAIM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | COMPLAINT – CLASS ACTION |
| vs. | ) ) | |
| INDEPENDENT LIVING SYSTEMS, LLC, | ) ) | Jury Trial Demanded |
| Defendants. | ) ) ) | |
| | ) | |

4855-6603-7348.v1

Plaintiff Monica Swaim ("Plaintiff"), by and through her attorneys of record, upon personal knowledge as to her own acts and experiences, and upon information and belief as to all other matters, files this complaint against Independent Living Systems, LLC ("ILS" or "Defendant") and alleges the following:

## I.  INTRODUCTION

1.       Plaintiff brings this class action complaint on behalf of a class of persons impacted by Defendant's failure to safeguard, monitor, maintain, and protect highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively, "Sensitive Information").  ILS is a healthcare services company providing a wide range of healthcare management services on behalf of healthcare plans, providers, hospitals, and community-based organizations.  ILS maintains ten offices in the United States and serves over 4,000,000 members.[1]  Defendant offers "a comprehensive range of turnkey payer services including clinical and third-party administrative costs to managed care organizations and providers that serve high-cost, complex member populations in the Medicare, Medicaid, and Dual-Eligible Market."[2]  As part of its services, Defendant collected, stored, and maintained Plaintiff's and the Class's Sensitive Information, which Plaintiff provided to ILS' partners or enrollees Yakan Medical Associates and Novant Health Gastroenterology.[3]

---

[1]   Richard Console, Jr., *Independent Living Systems, LLC Notifies More Than 4 Million People of Recent Data Breach*, JD Supra (Mar. 15, 203), https://www.jdsupra.com/legalnews/independent-living-systems-llc-notifies-5707133/.

[2]   Independent Living Systems, *About Us*, https://ilshealth.com/about-ils/ (last visited May 16, 2023).

[3]   The Data Breach Notice Defendant sent to Plaintiff stated that Defendant has "several partner health plans and their enrollees or referred individuals, including Humana."

- 1 -

2.      Starting around July 5, 2022, Defendant experienced a cyberattack during which criminal hackers obtained access to Plaintiff's and the Class's Sensitive Information and Defendant was locked out of certain computer systems.  Through investigation, Defendant learned that an unauthorized bad actor obtained access to certain Defendant systems between June 30 and July 5, 2022.  During that period, information on Defendant's network, including Plaintiff's and those similarly situated, was exfiltrated, accessible, and viewed by the unauthorized bad actor(s) (collectively, the "Data Breach").  Access to Defendant's systems provided the hackers access to Plaintiff's and the Class's Sensitive Data and the criminal hackers were fully capable of viewing, copying, and exfiltrating consumers' Sensitive Information.

3.      Defendant notified the Maine Attorney General's office that approximately 4,226,508 individuals were impacted by the Data Breach.

4.      Defendant issued a Notice of the Data Breach ("Notice") on March 14, 2023.  The Notice states:

> On July 5, 2022, [Defendant] experienced an incident involving the inaccessibility of certain computer systems on [Defendant's] network. [Defendant] responded to the incident immediately and began an investigation with the assistance of outside cybersecurity specialists. Through [Defendant's] response efforts, [Defendant] learned that an unauthorized actor obtained access to certain [Defendant] systems between June 30 and July 5, 2022. During that period, some information stored on [Defendant's] network was acquired by an unauthorized actor, and other information was accessible and potentially viewed. Upon containing the incident and reconnecting [Defendant's] computer systems, [Defendant] began to review the potentially affected data to determine whether it contained any personal information or [protected health information], and if so, to whom such information related.
>
> *      *      *
>
> As previewed above, [Defendant] conducted a comprehensive data review exercise to understand the scope of potentially affected information and identify the individuals to whom such information relates. On January 17, 2023, [Defendant] received the results of this review and determined that the following types of information related to you were included in one or more files acquired by the unauthorized actor or present in one or more files that resided on an area of the [Defendant] network that was accessed by an

- 2 -

unauthorized actor: name, date of birth, Medicare identification, Medicaid identification, and other health insurance information. Please note that [Defendant has] no evidence or other indication that identity theft or fraud occurred as a result of this incident. [Defendant is] providing this notice out of an abundance of caution.

5.     According to the final assessments, the Data Breach Defendant experienced exposed highly Sensitive Information, including: patients' full names, dates of birth, addresses, driver's license and social security numbers, state, taxpayer, Medicare, and Medicaid IDs, financial account information, medical diagnosis, admission and discharge information, mental and physical health information, treatment and prescription information, food delivery information, and other health insurance information, including billing and claims information.[4]  Due to its direct access to Defendant's medical records platform, hackers had the opportunity to obtain, sell, and misuse patients' Sensitive Information without their knowledge, leaving patients with no opportunity to take measures to protect themselves from the known, significant risk of harm that occurs when cybercriminals obtain Sensitive Information in a data breach.  That harm includes the risk of health insurance fraud, medical fraud, credit card fraud, and identity theft, among others.

6.     As a result of Defendant's lax data security, malicious cybercriminals have accessed the most sensitive details of the lives and the identities of millions of patients.  Due to Defendant's delayed notice of its Data Breach, the exact number of impacted individuals cannot be fully ascertained.  However, from notices provided by ILS, the Data Breach appears to have impacted at least four million individuals and likely many more.

---

[4]  Alicia Hope, *Massive Data Breach at Healthcare Provider ILS Compromises Millions of Patients*, CPO Magazine (Mar. 22, 2023), https://www.cpomagazine.com/cyber-security/massive-data-breach-at-healthcare-provider-ils-compromises-millions-of-patients/.

7.      Because the Data Breach compromised Plaintiff's Sensitive Information, Plaintiff and the Class (defined below) have been placed in an immediate and continuing risk of harm from fraud, identity theft, and related harm caused by the Data Breach.

8.      As a result of Defendant's conduct, Plaintiff and the Class have and will be required to continue to undertake time-consuming and often costly efforts to mitigate the actual and potential harm caused by the Data Breach. This includes efforts to mitigate the breach's exposure of their Sensitive Information, including by, among other things, placing freezes and setting alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, reviewing and monitoring credit reports and accounts for unauthorized activity, changing passwords on potentially impacted websites and applications, and requesting and maintaining accurate medical records. Minors may not be able to monitor the impact of the Data Breach on their lives for years, at which point the damage will be done.

9.      Plaintiff and the Class bring this action to recover for the harm they suffered, and assert the following claims: negligence, negligence *per se*, and declaratory judgment.

## II.      PARTIES

10.      Plaintiff Monica Swaim is now, and has at all relevant times been, a resident and citizen of North Carolina, currently residing in Boonville, North Carolina. Plaintiff is a current patient of two clinics in North Carolina that use ILS as a vendor. Plaintiff received a notice that her information was impacted by ILS's Data Breach. After Plaintiff's data was implicated in the Data Breach, she has noticed an increase in spam texts and spam calls. As a result, she spent, and continues to spend time and resources, including frequently monitoring her personal accounts and information and changing passwords on her personal accounts, including passwords for her email,

- 4 -

social media, and bank accounts, to prevent (or limit) identity theft. Plaintiff also ordered a credit report to further investigate any additional harm she may have suffered from the Data Breach.

11.     On or around March 14, 2023, Plaintiff received notice, via email, from Defendant that her Sensitive Information was implicated by the Data Breach.

12.     Defendant ILS is a Florida corporation with its principal place of business in Miami, Florida.

## III.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, Plaintiff is diverse from Defendant because Defendant is a corporation with a principal place of business in Miami, Florida, where they operate their principal headquarters. Plaintiff resides in the State of North Carolina.

14.     This Court has general personal jurisdiction over the Defendant because Defendant is at home in the Southern District of Florida and regularly conducts business in this State. Additionally, the acts and omissions giving rise to Plaintiff's claims occurred and emanated from this District.

15.     This Court is the proper venue for this action pursuant to 28 U.S.C. §1391(a) and (b) because Defendant's principal place of business is in this District.

- 5 -

4855-6603-7348.v1

## IV.     FACTUAL BACKGROUND

### A.     ILS Collected, Maintained, and Stored Sensitive Information

16.     ILS purports to offer a comprehensive range of payer services, including clinical and third-party administrative services to managed care organizations and providers that serve high-cost, complex member populations in the Medicare, Medicaid, and Dual Eligible Market.[5] ILS further claims to be an industry leader in managing home and community based programs for the last two decades and to leverage "an award winning technology platform."[6]   ILS offers assistance beyond the critical realm, including treatment of chronic illnesses and personalized care management including nutritional support.[7]   ILS states its mission to "significantly impact the quality of life of members by providing innovative health and social support solutions."[8]

17.     Through its services, ILS gains access to and control over Plaintiff's personal and medical information.   Specifically, patients, like Plaintiff and the Class, must provide their physicians and clinics with highly sensitive information, including PHI, PII, or both, to obtain treatment.   Clinics, in turn, enter that Sensitive Information into Defendant's software programs and electronic records platforms, whereupon Defendant compiles, stores, and maintains the highly sensitive PII and PHI concerning, among other things, patients' medical diagnostics, treatment, and other personal information documented by medical providers.   Defendant serves several facilities, and in turn millions of individuals every year.   As such, Defendant's systems contain a

---

[5]   *Supra*, note 2.

[6]   *Id.*

[7]   *Id.*

[8]   *Id.*

massive repository of Sensitive Information, acting as a particularly lucrative target for data thieves.[9]

18.     ILS represents that it is "required by law to maintain the privacy and security of [customers'] protected health information" and to that end, represents that it "implement[s] a variety of security measures to maintain the safety of [customers'] personal information." ILS further states that it will "promptly" notify customers if a breach occurs that may have compromised the privacy or security of customers' information.[10]

19.     Indeed, ILS promised its customers that it had adequate data security and would maintain the privacy of the PII and PHI under its control.

20.     Defendant was also on notice from various agencies and institutions about methods for implementing adequate data security, including recommendations from the U.S. Government, the United States Cybersecurity & Infrastructure Security Agency,[11] and the Microsoft Threat Protection Intelligence Team.[12]

21.     The Notice further represented that Defendant is "committed to protecting the confidential and security of the information [it] gather[s] in providing" its services.

22.     Defendant was obligated to implement reasonably secure data measures because of its: (a) portrayal of itself as capable and committed to data security on its systems; (b) purported

---

[9]  *Id.*

[10]  Independent Living Systems, *Privacy Policy*, https://ilshealth.com/privacy-policy/ (last visited May 16, 2023).

[11]  *See Protecting Against Ransomware*, CISA.gov (released Apr. 11, 2019, revised Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited May 16, 2023).

[12]  *See* Microsoft Defendant Threat Intelligence, *Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

knowledge of the steps necessary to prevent a significant data breach; (c) acceptance of its clients' patients' highly sensitive records; and (d) knowledge of the possibility of a data breach should it fail to secure its platform.

23.     Defendant, however, did not reasonably protect, secure, or store Plaintiff's and the Class's Sensitive Information prior to, during, or after the Data Breach.  Rather, it failed to employ reasonable data security measures.  Defendant knew or should have known, its security was insufficient to reasonably protect the highly Sensitive Information it maintained.

24.     Consequently, cybercriminals circumvented Defendant's security measures, resulting in a significant data breach that impacted millions of consumers or patients.

**B.     ILS Suffered a Massive Data Breach, Exposing Patients' Sensitive Information**

25.     ILS identified the Data Breach on July 5, 2022, and determined thereafter that unauthorized individuals had access to its network between June 30 and July 5, 2022.

26.     During that period, the unauthorized hackers exfiltrated files containing sensitive patient data including the names, contact information, Social Security numbers, Medicare/Medicaid IDs, health information, and health insurance information.

27.     Upon information and belief, the actors viewed, copied and exfiltrated substantial amounts of Plaintiff's and the Class's PII and PHI.  This included highly sensitive information such as patient names, dates of birth, medical record numbers, health insurance information, Social Security numbers, and information regarding the care received at the affected facilities.

28.     ILS posed a breach notice on its website in September 2022, and information on the HHS' Office for Civil Rights, using the placeholder of 501 records until the full extent of the breach was investigated and known.

29.     Then, ILS waited approximately eight months, until March 2023 to send individual notifications to the victims impacted by the Data Breach.  Affected individuals were offered limited credit monitoring services.

30.     Notices issued to impacted patients regarding the Data Breach recommended Plaintiff and the Class take several time-consuming steps to mitigate the risk of future fraud and identity theft, such as creating fraud alerts, submitting documents to the IRS, and credit freezes.

31.     Given that Defendant purposefully obtained and stored the PII and PHI of Plaintiff and the Class and knew or should have known of the serious risk and harm caused by a data breach, Defendant was obligated to implement reasonable measures to prevent and detect cyberattacks. This includes measures recommended by the Federal Trade Commission ("FTC"), required by the Health Insurance Portability and Accountability Act, and promoted by data security experts and other agencies.  This obligation stems from the foreseeable risk of a Data Breach given that Defendant collected, stored, and had access to a swath of highly sensitive patient records and data and, additionally, because other highly publicized data breaches at different healthcare institutions put Defendant on notice that the higher personal data it stored might be targeted by cybercriminals.

32.     Despite the highly sensitive nature of the information Defendant obtained, created, and stored, and the prevalence of health care data breaches, Defendant inexplicably failed to take appropriate steps to safeguard the PII and PHI of Plaintiff and the Class.  The Data Breach itself, and information Defendant has disclosed about the breach to date, including its length, the need to remediate Defendant's cybersecurity, the number of people impacted, and the sensitive nature of the impacted data, collectively demonstrate Defendant failed to implement reasonable measures to prevent the Data Breach.

4855-6603-7348.v1

**C.      Exposure of Sensitive Information Creates a Substantial Risk of Harm**

33.     The personal, health, and financial information of Plaintiff and the Class is valuable and has become a highly desirable commodity to data thieves.

34.     Defendant's failure to reasonably safeguard Plaintiff's and the Class's sensitive PHI and PII has created a serious risk to Plaintiff and the Class, including both a short-term and long-term risk of identity theft and other fraud.

35.     Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

36.     According to experts, one out of four data breach notification recipients becomes a victim of identity fraud.[13]

37.     Stolen Sensitive Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines and is frequented by criminals, fraudsters, and other wrongdoers.  Law enforcement has difficulty policing the "dark web," which allows users and criminals to conceal identities and online activity.

38.     Moreover, according to Robert P. Chappell, Jr., a law enforcement professional, fraudsters can steal and use a minor's information until the minor turns eighteen years old before the minor even realizes he or she has been the victim of an identity theft crime.[14]

---

[13]  Anne Saita, *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims,* ThreatPost.com (Feb. 21, 2013), https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/.

[14]  Robert P. Chappell Jr., *Child Identity Theft - What Every Parent Needs to Know* (Rowman & Littlefield Pub., Dec. 2017).

- 10 -

39.     The risk to minor Class members is substantial given their age and lack of established credit.  The information can be used to create a "clean slate identity," and use that identity for obtaining government benefits, fraudulent tax refunds, and other scams.  There is evidence that children are 51% more likely to be victims of identity theft than adults.[15]

40.     Purchasers of Sensitive Information use it to gain access to the victim's bank accounts, social media, credit cards, and tax details.  This can result in the discovery and release of additional Sensitive Information from the victim, as well as Sensitive Information from family, friends, and colleagues of the original victim.  Victims of identity theft can also suffer emotional distress, blackmail, or other forms of harassment in person or online.  Losses encompass financial data and tangible money, along with unreported emotional harms.

41.     The Federal Bureau of Investigation's ("FBI") Internet Crime Complaint (IC3) 2019 report estimated there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone.  The same report identified "rapid reporting" as a tool to help stop fraudulent transactions and mitigate losses.

42.     Defendant did not rapidly, or even reasonably timely, report to Plaintiff and the Class that their Sensitive Information had been exposed or stolen.

43.     The FTC has recognized that consumer data is a lucrative (and valuable) form of currency.  In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour reiterated that "most consumers cannot begin to comprehend the types and amount of information

---

[15] Avery Wolfe, *How Data Breaches Affect Children*, Axion Cyber Sols. (Mar. 15, 2018), https://axioncyber.com/data-breach/how-data-breach-affect-children/.

collected by businesses, or why their information may be commercially valuable.   Data is currency."[16]

44.   The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require:

(a)   encrypting information stored on computer networks;

(b)   retaining payment card information only as long as necessary;

(c)   properly disposing of personal information that is no longer needed or can be disposed of pursuant to relevant state and federal laws;

(d)   limiting administrative access to business systems;

(e)   using industry tested and accepted methods;

(f)   monitoring activity on networks to uncover unapproved activity;

(g)   verifying that privacy and security features function properly;

(h)   testing for common vulnerabilities; and

(i)   updating and patching third-party software.[17]

45.   The United States Cybersecurity & Infrastructure Security Agency, and other federal agencies, recommend similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implementing an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls,

---

[16] Statement of FTC Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable*, (Dec. 7, 2009) https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable.

[17] *Start With Security, A Guide for Business*, FTC https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (June 7, 2022).

4855-6603-7348.v1

automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

46.     The FTC cautions businesses that failure to protect Sensitive Information and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the fallout.[18]   Indeed, the FTC treats the failure to implement reasonable and adequate data security measures—like Defendant failed to do here—as an unfair act or practice prohibited by Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. §45 ("FTC Act").

### D.     The Healthcare Industry is Particularly Susceptible to Cyberattacks.

47.     A 2010 report focusing on healthcare data breaches found the "average total cost to resolve an identity theft related incident . . . came to about $20,000."[19]   According to survey results and population extrapolations from the National Study on Medical Identity Theft report from the Ponemon Institute, nearly 50% of victims reported losing their healthcare coverage because of a data breach and nearly 30% reported an increase in their insurance premiums.[20]   Several individuals were unable to fully resolve their identity theft crises.  Healthcare data breaches are an epidemic and they are crippling the impacted individuals—millions of victims every year.[21]

48.     According to an analysis of data breach incidents reported to the U.S. Department of Health and Human Services and the media, from 2015 and 2019 the number of healthcare related

---

[18] *Taking Charge, What to Do if Your Identity is Stolen*, FTC, https://www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0014-identity-theft.pdf (last visited May 16, 2023).

[19] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/tech/services-and-software/study-medical-identity-theft-is-costly-for-victims/.

[20] *Id.*

[21] *Id.*

security incidents increased from 450 annual incidents to 572 annual incidents, likely a conservative estimate.[22]

49.     According to the Verizon Data Breach Investigations Report, the health care industry, including hospitals and other providers, experienced 655 known data breaches, 472 of which had confirmed data disclosures in 2021.[23]  For the tenth year in a row, the healthcare industry has seen the highest impact from cyberattacks of any industry.[24]

50.     As a vendor of healthcare clinics that provide services to millions of patients Defendant knew or should have known the importance of protecting the Sensitive Information entrusted to it.  Defendant also knew of the foreseeable and catastrophic consequences if its systems were breached.  Despite this, Defendant failed to take reasonable data security measures to prevent or mitigate losses from cyberattacks.

**E.     Plaintiff's and the Class's PHI and PII are Valuable.**

51.     Unlike financial information, such as credit card and bank account numbers (which may have also been implicated in the Data Breach), the PHI and certain PII exfiltrated in the Data Breach cannot be easily changed.  Dates of birth and social security numbers are given at birth and

---

[22]  Heather Landi, *Number of patient records breached nearly triples in 2019*, Fierce Healthcare (Feb. 20, 2020), https://www.fiercehealthcare.com/tech/number-patient-records-breached-2019-almost-tripled-from-2018-as-healthcare-faces-new-threats#:~:text=OVer%2041%20million%20patient%20records,close%20to%2021%20million%20records.

[23]  Verizon, 2021 Data Breach Investigations Report: *Healthcare NAICS 62* (2021), https://www.verizon.com/business/resources/reports/dbir/2021/data-breach-statistics-by-industry/healthcare-data-breaches-security/.

[24]  *Five worthy reads: The never-ending love story between cyberattacks and healthcare,* ManageEngine (Aug. 6, 2021), https://blogs.manageengine.com/corporate/manageengine/2021/08/06/the-never-ending-love-story-between-cyberattacks-and-healthcare.html.

4855-6603-7348.v1

attach to a person for the duration of his or her life.  Medical histories are inflexible.  For these

reasons, these types of information are the most lucrative and valuable to hackers.[25]

52.     Birth dates, Social Security numbers, addresses, employment information, income,

and similar types of information can be used to open several credit accounts on an ongoing basis

rather than exploiting just one account until it is canceled.[26]  For that reason, cybercriminals on the

dark web are able to sell Social Security numbers for large profits.  For example, an infant's social

security number sells for as much as $300 per number.[27]  Those numbers are often then used for

fraudulent tax returns.[28]

53.     Consumers place a considerable value on their Sensitive Information and the

privacy of that information.  One 2002 study determined that U.S. consumers highly value a

website's protection against improper access to their Sensitive Information, between $11.33 and

$16.58 per website.  The study further concluded that to U.S. consumers, the collective "protection

against error, improper access, and secondary use of personal information is worth between $30.49

---

[25] *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters. (July 21, 2020), https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/.

[26] Tim Greene, *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers* (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[27] Selena Larson, *Infant Social Security Numbers are for sale on the dark* web, CNN Bus., (Jan. 22, 2018), https://money.cnn.com/2018/01/22/technology/infant-data-dark-web-identity-theft/index.html.

[28] *Id.*

and $44.62.[29]  This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

54.     Defendant's Data Breach exposed a variety of Sensitive Information, including Social Security numbers and PHI.

55.     The Social Security Administration ("SSA") warns that a stolen Social Security number can lead to identity theft and fraud: "Identity thieves can use your number and your credit to apply for more credit in your name."[30]  If the identity thief applies for credit and does not pay the bill, it will damage victims' credit and cause a series of other related problems.

56.     Social Security numbers are not easily replaced.  In fact, to obtain a new number, a person must prove that he or she continues to be disadvantaged by the misuse—meaning an individual must prove actual damage has been done and will continue in the future.

57.     PHI, also at issue here, is likely even more valuable than Social Security numbers and just as capable of being misused.  The FBI has found instances of PHI selling for fifty times the price of stolen Social Security numbers or credit card numbers.[31]

58.     Other reports found that PHI is ten times more valuable on the black market than credit card information.[32]  This is because one's personal health history, including prior illness, surgeries, diagnoses, mental health, and the like cannot be changed or replaced, unlike credit card

---

[29]  Il-Horn Hann, Kai-Lung Hui, *et al*, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17. Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

[30]  Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 16, 2023).

[31]  *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions*, FBI (May 6, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/.

[32]  Tim Greene, *supra* note 26.

4855-6603-7348.v1

information and even, under difficult circumstances, social security numbers. Credit card information and PII sell for on the black market, but PHI can sell for as much as $363 according to the Infosec Institute.[33]

59. Cybercriminals recognize and exploit the value of PHI and PII. The value of PHI and PII is the foundation to the cyberhacker business model.

60. Because the Sensitive Information exposed in Defendant's Data Breach is permanent data, there may be a gap of time between when it was stolen and when it will be used. The damage may continue for years. Plaintiff and the Class now face years of monitoring their financial and personal records with a high degree of scrutiny. The Class has incurred and will incur this damage in addition to any fraudulent use of their Sensitive Information.

### F. Defendant's Conduct Violates HIPAA

61. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), individuals' health information must be:

> properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being. The Privacy Rule strikes a balance that permits important uses of information while protecting the privacy of people who seek care and healing.[34]

62. HIPAA is a "federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or

---

[33] Ashiq JA, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[34] U.S. Dep't of Health & Human Servs., *Summary of the HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html, (last visited May 16, 2023).

knowledge."[35]  The rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.[36]

63.     HIPAA defines sensitive patient personal and health information as: (a) Name; (b) Home and work addresses; (c) Home and work phone numbers; (d) Personal and professional email addresses; (e) Medical records; (f) Prescriptions; (g) Health insurance information; (h) Billing information; (i) Social Security number; (j) Spouse and children's information; and/or (k) Emergency contact information.[37]

64.     To ensure protection of this private and sensitive information, HIPAA mandates standards for handling PHI—the very data Defendant failed to protect.  The Data Breach resulted from Defendant's failure to comply with several of these standards:

(a)     Violation of 45 C.F.R. §164.306(a)(1): failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits;

(b)     Violation of 45 C.F.R. §164.312(a)(1): Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights;

---

[35] CDC, *Health Insurance Portability and Accountability Act of 1996 (HIPAA)*, https://www.cdc.gov/phlp/publications/topic/hipaa.html#:~:text=The%20Health%20Insurance%20Portability%20and,the%20patient's%20consent%20or%20knowledge. (last visited May 16, 2023).

[36]  U.S. Dep't of Health & Human Servs., *supra* note 34.

[37]  *Id.*

(c)      Violation of 45 C.F.R. §164.308(a)(1): Failing to implement policies and procedures to prevent, detect, contain, and correct security violations;

(d)      Violation of 45 C.F.R. §164.308(a)(6)(ii): Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity;

(e)      Violation of 45 C.F.R. §164.306(a)(2): Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information;

(f)      Violation of 45 C.F.R. §164.306(a)(3): Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information;

(g)      Violation of 45 C.F.R. §164.306(a)(94): Failing to ensure compliance with HIPAA security standard rules by its workforce;

(h)      Violation of 45 C.F.R. §164.502, *et seq.*: Impermissibly and improperly using and disclosing protected health information that is, and remains, accessible to unauthorized persons; and

(i)      Violation of 45 C.F.R. §164.530(c): Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information.

65.      Despite Defendant's failure to reasonably protect Plaintiff's and the Class's Sensitive Information, it has not offered any compensation or adequate remedy considering the significant and long-term risk Plaintiff and the Class face.

- 19 -

## V.    CLASS ALLEGATIONS

66.    Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and all others similar situated, as representative of the following Class:

> All persons whose information was compromised by ILS' Data Breach or were sent notice that they were compromised by the Data Breach.

67.    Excluded from the Class are Defendant; its officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees.  Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

68.    Plaintiff reserves the right to modify and/or amend the Class definition, including but not limited to creating additional subclasses, as necessary.

69.    All members of the proposed Class are readily identifiable through Defendant's records.

70.    **Numerosity.**   The members of the Class are so numerous that joinder is impracticable.  Plaintiff is informed and believes that the proposed Class comprises of millions of patients.  The precise number of Class members is unknown to Plaintiff but may be ascertained from Defendant's records.

71.    **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions only affecting individual Class members.  These common legal and factual questions include, but are not limited to:

(a)    Whether Defendant owed Plaintiff and the other Class members a duty to adequately protect their Sensitive Information;

- 20 -

(b)      Whether Defendant owed Plaintiff and the other Class members a duty to implement reasonable data security measures due to the foreseeability of a data breach;

(c)      Whether Defendant owed Plaintiff and the other Class members a duty to implement reasonable data security measures because Defendant accepted, stored, created, and maintained highly sensitive information concerning Plaintiff and the Class;

(d)      Whether Defendant knew or should have known of the risk of a data breach;

(e)      Whether Defendant breached its duty to protect the PII and PHI of Plaintiff and Class members;

(f)      Whether Defendant knew or should have known about the inadequacies of its data protection, storage, and security;

(g)      Whether Defendant failed to use reasonable care and reasonable methods to safeguard and protect Plaintiff's and the Class's Sensitive Information from unauthorized theft, release, and disclosure;

(h)      Whether proper data security measures, policies, procedures and protocols were enacted within Defendant's offices and computer systems to safeguard and protect Plaintiff's and the Class's Sensitive Information from unauthorized theft, release or disclosure;

(i)      Whether Defendant's conduct was the proximate cause of Plaintiff's and the Class's injuries;

(j)      Whether Plaintiff and the Class suffered ascertainable and cognizable injuries as a result of Defendant's misconduct;

(k)      Whether Plaintiff and the Class are entitled to recover damages; and

(l)      Whether Plaintiff and the Class are entitled to other appropriate remedies including injunctive relief.

- 21 -

72.    Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of herself and the Class.  Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

73.    **Typicality.**  Plaintiff's claims are typical of those of other Class members because Plaintiff's PHI and PII, like that of every other Class member, was misused and improperly disclosed by Defendant.  Defendant's misconduct impacted all Class members in a similar manner.

74.    **Adequacy.**  Plaintiff intends to prosecute this case vigorously and will fairly and adequately represent and protect the interest of the members of the Class.  Plaintiff has retained counsel experienced in complex consumer class action litigation.  Plaintiff has no adverse or antagonistic interests to those of the Class.

75.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that would occur with individual litigation of their claims against Defendant.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

## CLAIMS

### COUNT I
### Negligence
### (on behalf of Plaintiff and the Class)

76.     Plaintiff realleges and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

77.     Defendant collected, stored, and maintained Plaintiff's and the Class's Sensitive Information on behalf of clinics and provided medical and records retention software to clinics who served Plaintiff and the Class.

78.     Plaintiff and the Class are a well-defined, foreseeable, and probable group of patients that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.  The nature of Defendant's business requires medical or care providing facilities to provide the Sensitive Information of its patients that Defendant unilaterally collects, maintains, and stores.  That information includes medical histories, dates of birth, addresses, phone numbers, and medical insurance information.  Therefore, as part of Defendant's services, it must use, handle, gather, and store the Sensitive Information of Plaintiff and the Class and, additionally, solicit and create records containing Plaintiff's and the Class's Sensitive Information.

79.     A large depository of highly valuable health care information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information and Defendant warned clinics numerous times of the serious risk of a data breach and the need to implement reasonable data security.

80.     Defendant knew or should have known that, given its repository of a host of Sensitive Information for millions of patients posed a significant risk of being targeted for a data breach.  Thus, Defendant had a duty to reasonably safeguard its patients' data by implementing

reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiff and the Class of inadequate data security created a duty to act to reasonably and safeguard the Sensitive Information.

81.     Defendant owed a duty to Plaintiff and the Class to exercise reasonable care in safeguarding and protecting their Sensitive Information in its possession from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

82.     This duty included, among other things, designing, maintaining, and testing its security systems to ensure that Plaintiff's and the Class's PHI and PII was adequately protected and secured. Defendant further had a duty to implement processes that would detect a breach of their security system in a timely manner.

83.     Defendant also had a duty to timely disclose to Plaintiff and the Class that their Sensitive Information had been or was reasonably believed to have been compromised. Timely disclosure is necessary so that, among other things, Plaintiff and the Class may take appropriate measures to monitor their accounts for unauthorized access, to contact the credit bureaus to request freezes or place alerts and take all other appropriate precautions, including those recommended by Defendant.

84.     Additionally, HIPAA creates industry standards for maintaining the privacy of health-related data. Defendant knew or should have known it had a legal obligation to secure and protect Plaintiff's and the Class's Sensitive Information and that failing to do so is a serious violation of HIPAA.

85.     Defendant also should have known that, given the Sensitive Information it held, Plaintiff and the Class would be harmed should it suffer a Data Breach. Defendant knew or should

have known that their systems and technologies for processing and securing Plaintiff's and the Class's PHI and PII had security vulnerabilities susceptible to cyberattacks.

86.     Despite that knowledge, Defendant failed to implement reasonable data security measures, which allowed cybercriminals to successfully breach Defendant's network and data environments, reside there undetected for a significant period of time, and access or steal a host of personal and healthcare information on millions of Defendants' clients' patients.

87.     Defendant failed to provide reasonable security for the data in its possession.

88.     Defendant breached is duty to Plaintiff and the Class by failing to adopt, implement, and maintain reasonable security measures to safeguard their Sensitive Information, allowing unauthorized access to Plaintiff's and the Class's PHI and PII, and failing to recognize the Data Breach in a timely manner.  Defendant further failed to comply with industry regulations and exercise reasonable care in safeguarding and protecting Plaintiff's and the Class's PHI and PII.

89.     But for Defendant's wrongful and negligent breach of its duties, Plaintiffs' Sensitive Information would not have been accessed and exfiltrated by unauthorized persons, and they would not face a risk of harm of identity theft, fraud, or other similar harms.

90.     As a result of Defendant's negligence, Plaintiff  and the Class suffered damages including, but not limited to, ongoing and imminent threat of identity theft crimes; out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or fraud; credit, debit, and financial monitoring to prevent and/or mitigate theft, identity theft, and/or fraud incurred or likely to occur as a result of Defendant's security failures; the value of their time and resources spent mitigating the identity theft and/or fraud; decreased credit scores and ratings; and irrecoverable financial losses due to fraud.

- 25 -

91.     Consequently, Plaintiff seeks actual and compensatory damages, injunctive relief, attorneys fees' and expenses, and all other remedies available under law.

**COUNT II**
**Negligence *Per Se***
**(on behalf of Plaintiff and the Class)**

92.     Plaintiff realleges and incorporates by reference every allegation contained in the paragraphs above as though fully stated herein.

93.     ILS' conduct constitutes negligence *per se* because it was in violation of several statutes enacted for the safety and protection of the public, including Plaintiffs and the Class.

94.     Section 5 of the FTC Act, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII.  Various FTC publications and orders also form the basis of Defendant's duty.

95.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and the Class's PHI and PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, the foreseeable consequences of a data breach, and Defendant's knowledge that inadequate data security could result in a data breach that imposes "staggering" costs on clinics and patients.

96.     Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

97.     The harm that has occurred and been imposed on Plaintiff and the Class is the type of harm the FTC Act (and similar state statutes) was intended to guard against.  Indeed, the FTC has pursued over 50 enforcement actions against businesses which, because of their failure to

- 26 -

employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the proposed Class.

98.    Additionally, Defendant's violation of HIPAA constitutes negligence *per se*.

99.    HIPAA, 45 C.F.R. Part 164 governs "Security and Privacy," with Subpart A providing "General Provisions," Subpart B regulating "Security Standards for the Protection of Electronic Protected Health Information," Subpart C providing requirements for "Notification in the Case of Breach of Unsecured Protected Health Information."  Under 45 C.F.R. §164.306, HIPAA "standards, requirements and implementation specifications" apply to covered entities, such as Defendant.  HIPAA requires Defendant to "ensure the confidentiality, integrity, and availability of all electronic protected health information" it receives and to protect against any "reasonably anticipated threats or hazards to the security or integrity" of the Sensitive Information. 45 C.F.R. §164.306.

100.    Defendant also violated HIPAA by failing to adhere to and meet the requirements of 45 C.F.R. §§164.308, 164.310, 164.312, 164.314, and 164.316.

101.    Defendant also violated HIPAA by failing to use reasonable measures to protect the PII and PHI of Plaintiff and Class.  Defendant's conduct was especially unreasonable given the nature of the Sensitive Information and the number of patients it serves, some of which are minors or patients who live below the federal poverty level, who may not have the means to expend significant amounts of time and money to fully mitigate the fallout of the Data Breach.

102.    HIPAA requires timely notice of data breaches to each impacted consumer. Specifically, HIPAA requires notice to be issued "in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §164.404.  Notice must include certain minimum information,

including, but not limited to a description of what the entity is doing to investigate the breach and mitigate harm.

103.    Defendant breached HIPAA's notification requirements by failing to give timely and complete notice.  Defendant waited approximately eight months from the date it was made aware of the Data Breach to notify the clinics, who are still issuing notices to the victims.

104.    As a direct and proximate result of Defendant's violations of the FTC Act and HIPPA, Plaintiff and the Class have been injured and are entitled to damages in an amount to be proven at trial.

105.    Plaintiff seeks actual and compensatory damages, injunctive relief, attorneys' fees and expenses, and all other remedies available under the law.

**COUNT III**
**Declaratory Judgment**
**(on behalf of Plaintiff and the Class)**

106.    Plaintiff realleges and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

107.    Pursuant to 28 U.S.C. §2201(a), this Court has the power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed.  Further, this Court has the power to declare either affirmative or negative decrees in form and effect, such as restraining acts that violate the laws described in this Complaint.

108.    Whether Defendant's actions caused the Data Breach and subsequent harm to Plaintiff and the Class, and whether Defendant is presently maintaining adequate data security measure to safeguard Plaintiff and the Class from further data breaches is an actual controversy.

109.    Plaintiff and the Class are at a substantial and imminent risk of further compromise of their Sensitive Information.  This is true irrespective of whether Plaintiff and the Class are

- 28 -

current patients of Defendant, or one of the facilities Defendant serves, because Defendant still maintains a swath of Plaintiff's and the Class's Sensitive Information.  It is not clear whether Defendant has the ability and technical skill to prevent additional data breaches, or whether ILS is doing anything to fix the problems that caused the Data Breach.

110.    Therefore, this Court should enter a judgment declaring the following:

(a)    Defendant owed a legal duty, at the time of the Data Breach, to Plaintiff and members of the proposed Class to reasonably protect and secure their Sensitive Information under the common law, HIPAA, FTC Act, 15 U.S.C. §45(a)(1), and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681(b);

(b)    Defendant owed a legal duty to Plaintiff and members of the proposed Class to provide timely notice of the Data Breach under the common law, HIPAA, FTC Act, 15 U.S.C. §45(a)(1), and FCRA, 15 U.S.C. §1681(b);

(c)    Defendant continues to owe a legal duty to Plaintiff and members of the proposed Class to protect and secure their Sensitive Information under the common law, HIPAA, FTC Act, 15 U.S.C. §45(a)(1), and FCRA, 15 U.S.C. §1681(b); and

(d)    Defendant continues to owe a legal duty to Plaintiff and members of the proposed Class to provide timely notice of data breaches under the common law, HIPAA, FTC Act, 15 U.S.C. §45(a)(1), and FCRA, 15 U.S.C. §1681(b).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment and relief as follows:

(a)    Certification the Class pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and an order that notice be provided to all Class Members;

- 29 -

(b)     Designation of Plaintiff as Class representative and the undersigned counsel as Class Counsel;

(c)     An award of damages in an amount to be determined at trial or by this Court;

(d)     An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

(e)     An award of statutory interest and penalties;

(f)     An award of costs and attorneys' fees; and

(g)     Such other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: May 17, 2023                    Respectfully submitted,

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
STUART A. DAVIDSON
FLORIDA BAR NO. 0084824
ALEXANDER A. COHEN
FLORIDA BAR NO. 1002715
ANNY MARIE MARTIN
FLORIDA BAR NO. 1000491

      s/ Stuart A. Davidson
      STUART A. DAVIDSON

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com

**THE JOHNSON FIRM**
CHRISTOPHER D. JENNINGS*
Tyler B. Ewigleben*
610 President Clinton Ave., Suite 300
Little Rock, AR 72201
Tel: (501) 372-1300

- 30 -

4855-6603-7348.v1

chris@yourattorney.com
tyler@yourattorney.com

**ZIMMERMAN REED LLP**
BRIAN C. GUDMUNDSON*
RACHEL K. TACK*
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
rachel.tack@zimmreed.com

*To be admitted *pro hac vice*

*Counsel for Plaintiff and the Proposed Class*

4855-6603-7348.v1